1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   NATHANIEL WILLIAM,

11           Petitioner,                    No. CIV S-02-2323 LKK KJM P

12       vs.

13   BOARD OF PRISON TERMS,

14           Respondent.                    FINDINGS AND RECOMMENDATIONS

15   _____/

16           Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254.   He challenges a 2000 denial of parole on five grounds:

18   (1) the denial of parole violates his plea bargain, which struck the special circumstances attached

19   to the murder charge that would have led to a term of life without the possibility of parole; (2) the

20   parole board failed to consider the factors supporting a finding of his suitability for parole and

21   considered only the factors supporting its determination of unsuitability; (3) the board's delay in

22   conducting the hearing violated petitioner's rights; (4) the board's consideration of his

23   commitment offense and consideration of the stricken "special circumstance" violated double

24   jeopardy principles; and (5) the board's decision to schedule his next hearing in two years rather

25   than one year was based on the facts used to find him unsuitable for parole in violation of his

26   federal rights.

I. <u>Background</u>

Petitioner pleaded guilty to first degree murder in 1982 and was committed to prison for a term of twenty-five-years-to-life.  Answer, Ex. A.

Petitioner appeared before the parole board on July 27, 2000.  <u>Id</u>., Ex. B (transcript of parole hearing).

The parole board denied petitioner parole:

> The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that you're not suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison.  The offense was carried out in an especially callous manner and in a manner which indicates very little compassion for the victim.  In this particular case the prisoner was armed with a handgun committing an armed robbery, attempted armed robbery it was, demanded money, ended up shooting and killing the victim.  The prisoner had not profited from society's previous attempts to correct his criminality which included prior camp programs.  He was a ward of the court on several occasions.  He had gone to camp for attempted robbery and he had arrests for runaway, grand theft, burglary, auto theft, receiving stolen property, possession of cocaine.   The prisoner has not sufficiently participated in self-help and therapy programming.  The District Attorney's Office has voiced opposition to the granting of a parole date.  The prisoner should be commended for having reduced his classification score. Ms.  Skipper-Dotta [petitioner's counsel] is probably right because he hasn't had any 115s so it's probably less than 43 and probably would be around 35.  It's still high but it's not as high as it used to be so that's a good thing.  He's had a number of 115s since he's been incarcerated for things such as stimulants and sedatives and possession of marijuana and weapons.  But he's done some good things in vocational auto body.  He's had a number of laudatories including one for putting a fire out.  He's been in the literacy program, Lifer Therapy group, Creative Self-Expression, Pro-Social Behavior, Road to Freedom, Parolee Recidivism Prevention class, Straight Life and he was in air frame and air engine.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> However these positive aspects of his behavior do not outweigh the factors of unsuitability.  This is a two year denial.  The Panel finds it's not reasonable to expect that parole will be granted in the next two years number one for the life crime wherein you killed an innocent human being who was apparently just sweeping up a parking lot and who was accosted by the prisoner who was armed with a handgun and the prisoner shot and killed the victim.  The

2

1        prisoner had a number of 115s which were of some concern to the
Panel.  He's in one respect to be commended for having put some
2        time and distance between himself and the last 115 which was
about four years ago but they were serious in terms of stimulants
3        and sedatives and under the influence of marijuana and possession
of weapons.  He has not sufficiently participated in self-help and
4        therapy programming.  And the Panel recommends that you remain
disciplinary-free and if possible upgrade educationally and
5        vocationally.  You do have the auto body and the air frame and
engine and things like that but for sure participate in available self-
6        help and therapy programming including AA and NA.

7  Id., Ex. B at 29-31.

8        Petitioner then challenged the denial through the administrative process, and then

9  further through successive habeas petitions in the state courts.  Petition (Pet.), Exs. A-B, G-I.

10  II.  Standards Under The AEDPA

11        An application for a writ of habeas corpus by a person in custody under a

12  judgment of a state court can be granted only for violations of the Constitution or laws of the

13  United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

14  claim decided on the merits in state court proceedings unless the state court's adjudication of the

15  claim:

16        (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established federal law, as
17        determined by the Supreme Court of the United States; or

18        (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
19        State court proceeding.

20  28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

21  365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

22  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

23  Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

24  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

25  /////

26  /////

1  not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to

2  address the merits of a particular claim, but may simply deny a habeas application on the ground

3  that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

4  Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

5  courts to review state court decisions for error before determining whether relief is precluded by

6  § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

7  by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

8            The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

9  different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 2000)] that an unreasonable application is different
> from an incorrect one.

17  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

18  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

19  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

20  (2002).

21  /////

22

23       [1]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
   held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
24   claims will have no determinative effect in the case before us . . .  At best, it is constitutional
   dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
25   relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
   28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
26   of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
   Ramirez, 365 F.3d at 773-75.

1    The court will look to the last reasoned state court decision in determining

2    whether the law applied to a particular claim by the state courts was contrary to the law set forth

3    in the cases of the United States Supreme Court or whether an unreasonable application of such

4    law has occurred.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002), <u>cert</u>. <u>dismissed</u>, 538 U.S.

5    919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

6    of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

7    must perform an independent review of the record to ascertain whether the state court decision

8    was objectively unreasonable.  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  In other

9    words, the court assumes the state court applied the correct law, and analyzes whether the

10   decision of the state court was based on an objectively unreasonable application of that law.

11   It is appropriate to look to lower federal court decisions to determine what law has

12   been "clearly established" by the Supreme Court and the reasonableness of a particular

13   application of that law.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir. 1999).

14   III.  <u>Liberty Interest In Parole</u>

15   In a supplemental answer, respondent argues that petitioner does not have a

16   federally protected liberty interest in parole and so his petition does not present a federal question

17   cognizable in this action.

18   In <u>Greenholtz v. Nebraska Penal Inmates</u>, 442 U.S. 1, 7, 11 (1979), the United

19   States Supreme Court found that an inmate has "no constitutional or inherent right" to parole,

20   even when a state establishes a system of conditional release from confinement.  The Court

21   recognized, however, that the structure of parole statutes might give rise to a liberty interest in

22   parole that would, in turn, mean an inmate was entitled to certain procedural protections.  <u>Id.</u> at

23   14-15.  In <u>Greenholtz</u>, the Court found that the "mandatory language and the structure of the

24   Nebraska statute at issue" created such a liberty interest.  <u>Board of Pardons v. Allen</u> (<u>Allen</u>), 482

25   U.S. 369, 371 (1987).  What the court found significant in the Nebraska statute and later, in

26   <u>Allen</u>, in the Montana parole statutes, was mandatory language: the use of the word "shall" and

5

1   the presumption that parole would be granted unless certain conditions were shown to exist.

2   Greenholtz, 442 U.S. at 11-12; Allen, 482 U.S. at 377-78.

3             In McQuillion v. Duncan, 306 F.3d 895 (9th Cir.  2002), the Ninth Circuit used

4   the Greenholtz-Allen framework to determine whether California statutes created a liberty

5   interest in parole.  The critical statute at issue in McQuillion is California Penal Code section

6   3041, which provides in relevant part:

7          (a) . . . One year prior to the inmate's minimum eligible parole
           release date a panel . . .  shall again meet with the inmate and shall
8          normally set a parole release date as provided. . . .The release date
           shall be set in a manner that will provide uniform terms for
9          offenses of similar gravity and magnitude in respect to their threat
           to the public,  and that will comply with the sentencing rules that
10         the Judicial Council may issue and any sentencing information
           relevant to the sentencing of parole release dates. . . . .
11
           (b) The panel . . . shall set a release date unless it determines that
12         . . . consideration of the public safety requires a more lengthy
           period of incarceration. . . .
13

14  The Ninth Circuit found that subdivision (b) was like the statutes in both Greenholtz and Allen:

15         California's parole scheme gives rise to a cognizable liberty interest
           in release on parole. The scheme "'creates a presumption that
16         parole release will be granted'" unless the statutorily defined
           determinations are made.
17

18  McQuillion, 306 F.3d at 901-02.  Again in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003),

19  the Court of Appeals reiterated its holding that the California parole scheme created a liberty

20  interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the

21  question because its "language clearly parallels the language" under consideration in Greenholtz

22  and Allen.  See also In re Rosenkrantz, 29 Cal.4th 616, 654 (2002), cert. denied, 538 U.S. 980

23  (2003) (discussing § 3041(b), the California Supreme Court noted "parole applicants . . . have an

24  expectation that they will be granted parole unless the Board finds . . . that they are unsuitable in

25  light of the circumstances specified by statute and regulation").

26  /////

6

1          Respondent argues that the legal landscape has been changed by the combined

2   impact of three cases decided after Greenholtz and Allen:  In re Dannenberg, 34 Cal.4th 1061

3   (2005), cert. denied, ___ U.S. ___, 126 S. Ct. 92 (2005), Sass v. California Board of Prison

4   Terms, 376 F.Supp.2d 975 (E.D. Cal.  2005),[2] and Sandin v. Conner, 515 U.S. 472 (1995).   In

5   Dannenberg, the California Supreme Court noted:

6                  Our conclusion that California's parole statutes allow the Board to
                   find unsuitability without engaging in a comparative analysis of
7                  other offenses or applying "uniform term" principles, and that the
                   Board adhered to state law in Dannenberg's case also disposes of
8                  his contention that he was denied federal due process rights arising
                   from his protected liberty interest, and expectation, in a "uniform"
9                  parole date.

10   Dannenberg, 34 Cal.4th at 1098 n.18.  In Dannenberg, the court resolved the "tension between

11   the commands in subdivisions (a) and (b)" of Penal Code section 3041, and the question whether

12   "the public-safety provision of subdivision (b) takes precedence over the 'uniform terms'

13   principle of subdivision (a)."  Id. at 1081-82.  To answer the question, the court examined related

14   legislation, statutory language, case law and agency interpretations.  It noted that

15                  [s]o long as the Board's finding of unsuitability flows from
                    pertinent criteria, and is supported by "some evidence" in the
16                  record before the Board, the overriding statutory concern for public
                    safety in the individual case trumps any expectancy the
17                  indeterminate life inmate may have in a term of comparative
                    equality with those served by other similar offenders.  Section 3041
18                  does not require the Board to schedule an inmate's release when it
                    reasonably believes the gravity of the commitment offense
19                  indicates a continuing danger to the public, simply to ensure that
                    the length of the inmate's confinement will not exceed that of
20                  others who committed similar crimes.

21   Id. at 1084 (internal citation omitted).  The court recognized the Board's broad discretion in

22   determining an inmate's suitability for parole, but also recognized that "the current statute

23   requires the Board to act in each case, either by setting a parole release date, or by expressly

24   declining to do so for reasons of public safety."  Id. at 1098.  Its ultimate holding is this:

25   _____

26          [2] Sass has been appealed to the Ninth Circuit Court of Appeal, with oral argument
scheduled for March 16, 2006.  See Case No. 05-16455 (9th Cir. Aug. 1, 2005).

7

> We therefore hold that the Board proceeded lawfully when, without comparing Dannenberg's crime to other second degree murders, to its base term matrices, or to the minimum statutory prison term for that offense, the Board found him unsuitable to receive a fixed and "uniform" release date by pointing to some evidence that the particular circumstances of his crime . . . indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.

Id. at 1098.  What Dannenberg did, then, was to find that the provisions of section 3041(a), which appear to require the Board to set a minimum, uniform term, did not create a liberty interest in parole, because the parole board was required to undertake the public safety inquiry of subdivision (b) before setting a uniform term.  Because the Ninth Circuit's determination in McQuillion that the statute does create a liberty interest in parole is based on subdivision (b), Dannenberg does not undercut the McQuillion holding.

The California Supreme Court in Dannenberg did discuss subdivision (b) at length.  In the course of that discussion, it noted that the word "shall" in both subdivisions is not used in the absolute sense, but rather is limited in subdivision (b) "by 'unless,' followed by the rule that the Board should *not* set a release date if 'consideration of the public safety' requires lengthier incarceration for the particular inmate."  Id. at 1087 (emphasis in original).

In Sass, the second case relied on by respondents, the district court relied on the Dannenberg definition of "shall," the statutory scheme of section 3041, California jurisprudence denying the existence of a right to parole, and the broad discretion given to the parole board to conclude that the California statute does not create a liberty interest in parole.  Sass, 376 F.Supp.2d at 982-83.

As noted above, however, the California Supreme Court's focus in Dannenberg was the minimum and/or uniform term provisions of subdivision (a), not the contours of subdivision (b) as a separate provision.  That court's exegesis of the statutory scheme was designed to resolve the tension between the two subdivisions; in so doing, it rejected the notion that subdivision (a) created any liberty interest in a uniform date or otherwise took precedence

8

1  over the public safety concerns of subdivision (b).  The court did not hold that subdivision (b)

2  similarly did not give rise to a liberty interest in parole, though it had the opportunity to do so.

3         Moreover, the Dannenberg court did not overrule Rosenkrantz, but instead relied

4  on that case throughout its explication of the state's parole scheme.  See, e.g. Dannenberg, 34

5  Cal.4th at 1082 (relying on Rosenkrantz's description of the parole board's discretion).  Thus,

6  Rosenkrantz's recognition that "[t]he judicial branch is authorized to review the factual basis of a

7  decision of the Board denying parole in order to ensure that the decision comports with the

8  requirements of due process of law" and of inmates' expectation they will be granted parole

9  absent public safety considerations remains intact.  Rosenkrantz, 29 Cal.4th at 618, 654, 658.

10         The limited nature of Dannenberg's reach is illustrated by the decisions of the

11  state Courts of Appeal that have considered parole habeas petitions after Dannenberg's

12  publication.  In In re Fuentes, 135 Cal.App.4th 152, 160-61 (4th Dist. 2005), the court described

13  Dannenberg as clarifying parole standards in its rejection of the notion that the Board must

14  undertake a comparative analysis of similar crimes before denying parole based on public safety

15  concerns.  See also In re Lowe, 130 Cal.App.4th 1405, 1418-19 (6th Dist. 2005) (parole is the

16  rule rather than the exception); In re DeLuna, 126 Cal.App.4th 585, 591 (6th Dist. 2005) (a court

17  must consider whether the Board's procedures satisfy due process); In Re Shaputis, 135

18  Cal.App.4th 217, 227 (4th Dist. 2005) ("We are charged with the obligation to ensure the BPT's

19  decision comports with the requirements of due process of law . . .").

20         Taking into account Dannenberg in its entirety, and its state court progeny, the

21  undersigned is of the opinion that the California Supreme Court described the word "shall" in

22  subdivision (b) as "not used in an absolute sense" only because it was limited by the phrase

23  "unless it [the Board] determines that . . . consideration of the public safety requires a more

24  lengthy period of incarceration."  The court did not say "shall" was no longer a command, only

25  that the command had modifiers.

26  /////

1      The limitation recognized by the California Supreme Court does not

2  fundamentally alter this court's understanding of California's parole statute at this point in time.[3]

3  The United States Supreme Court found the Nebraska law under consideration in Greenholtz to

4  create a liberty interest in parole even though the law said the parole board "shall order [an

5  inmate's] release unless it is of the opinion that his release should be deferred" for several

6  specified reasons. Greenholtz, 442 U.S. at 11.  The Montana statute at issue in Allen provided

7  that "the board shall release" inmates "when in its opinion" certain requirements were met.

8  Allen, 482 U.S. at 376-77.  As the Court explained:

9           We reject the argument that a statute that mandates release "unless" certain
            findings are made is different from a statute that mandates release "if,"
10          "when," or "subject to" such findings being made.  Any such statute
            "creates a presumption that parole release will be granted."

11

12  Id. at 378.  Subdivision (b) is the fraternal twin of the statute in Greenholtz; whether or not

13  "shall" is used in an absolute sense, the statute creates a liberty interest in parole.

14      That California's parole board exercises broad discretion in making parole

15  determinations is not inconsistent with the determination that the statute creates a liberty interest

16  in parole.  In Greenholtz, the Supreme Court recognized the similar "broad discretion" vested in

17  the parole board, but found a liberty interest even so.  Greenholtz, 442 U.S. at 13.   Respondent

18  has offered no reason why this aspect of Greenholtz is no longer valid.

19      In the instant case, in addition to relying on section 3041(b)'s conditional liberty

20  interest, petitioner includes a challenge to the parole board's refusal to set a base, uniform term.

21  Here, Dannenberg's interpretation of California law – that such a term need not be set if the

22  Board finds that release would not be in the interests of public safety – does bind this court.

23  Sass, 376 F.Supp.2d at 982.  Only this portion of the petition fails to raise a federal question.

24  /////

25  _____

26  [3]  See Sass v. California Board of Prison Terms, Case No. 01-CIV-S-0835 MCE KJM
    (E.D. Cal.), Findings and Recommendations filed Mar. 16, 2005 at 4-5.

1    B.  Sandin

2         In Sandin v. Conner, 515 U.S. 472 (1995), the United States Supreme Court

3    addressed the question of when due process liberty interests are created by internal prison

4    regulations.  The Court concluded it would abandon an examination of "mandatory language"

5    and instead focus its liberty interest inquiry on ensuring "freedom from restraint which ...

6    imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of

7    prison life."  Id. at 484.  Respondent argues this standard now governs the determination of

8    whether section 3041(b) creates a liberty interest in parole.

9         In McQuillion, 306 F.3d at 903, and again in Biggs, 334 F.3d at 914-15, the Ninth

10   Circuit rejected the application of Sandin to a determination of whether a statute creates a liberty

11   interest in parole.  See also Sass, 376 F.Supp.2d at 980-81.  Respondent cites cases from other

12   circuits that have applied Sandin in cases that do not raise challenges to conditions of

13   confinement.  Respondent points to no Supreme Court or Ninth Circuit authority in support of

14   his position.  Based on the record before it, and its reading of the case law, this court is bound to

15   follow McQuillion and Biggs.

16   IV.  Analysis Of Substantive Claims In Petition

17         The last reasoned decision from the state courts, which this court must examine,

18   is that issued by the San Joaquin County Superior Court.  Ylst v. Nunnemaker, 501 U.S. 797,

19   803-04 (1991).  The Superior Court denied petitioner's claims:

20         15 CCR 2402(b) provides that the information considered in
            determining parole suitability shall include the prisoner's behavior
21         before, during, and after the commitment offense.  The fact that
            petitioner's plea bargain avoided a special circumstance sentence
22         which would have made him ineligible for parole, does not
            preclude the Board of Prison Terms from considering the
23         circumstances of the offense in determining his suitability for
            parole.  Evidence submitted with the petition indicates the Board
24         considered all relevant information available in determining
            petitioners [sic] suitability for parole.  Circumstances set forth in
25         15 CCR 2402 tending to indicate suitability and unsuitability are
            set forth as general guidelines only.  The importance attached to
26         any circumstance or combination of circumstances in a particular

case is left to the judgment of the parole panel. There is no indication the panel's parole suitability determination was the result of an unwritten policy to deny parole rather than an appropriate consideration of the circumstances set forth in 15 CCR 2402.

Petitioner also contends the decision to set his next parole hearing in two years failed to take into account the 10-month delay before the July 27, 2000 hearing the decision to set the next hearing date in two years was based on the same facts that were used to find petitioner unsuitable for parole. [sic]

Penal Code 3041.5(b)(2)(A) provides for annual subsequent parole suitability hearings, except the next hearing may be held in two years if the Board of Prison Terms finds it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding. Regardless of whether petitioner's July 27, 2000 parole hearing was held within three years of the initial hearing, the determination that it was not reasonable to expect parole would be granted during the year following that hearing justified a two-year delay to the next hearing. The reasons for postponing a subsequent parole suitability hearing beyond one year must be stated separately from the reasons for finding a prisoner unsuitable for parole and must be specifically directed to that question. However, that does not mean the reasons for refusing to set a parole date must necessarily be completely different from the reasons for excepting an inmate's case from annual review. The latter decision involves a prediction that at least during the period of the postponement, an inmate will not likely become suitable for parole. That prediction may involve some of the same facts on which the unsuitability determination is based. What is required, however, is an identification of reasons which justify the postponement. [case citation omitted] The reasons for finding petitioner unsuitable for parole and for finding it not reasonable to expect that parole would be granted at a hearing during the following year were separately stated. The nature of the committing offense was used, and could be used, as one of the reasons for both decisions.

Pet., Ex. G at 2-3.

A. Violation Of Plea Bargain

When a criminal defendant pleads guilty in exchange for certain promised actions, his right to due process of law entitles him to fulfillment of those promises. Santobello v. New York, 404 U.S. 257, 262 (1971). In this case, petitioner alleges that his plea of guilty to murder "was premised upon a dismissal of the 'special circumstances' allegations," yet the board's

1  finding that the offense was carried out in an especially callous manner revived those dismissed

2  factors.  Pet. at 5(a)-5(b).

3          Petitioner has presented nothing showing that the nature of his guilty plea or that

4  any bargain leading to the plea included a promise that the parole board would be forbidden to

5  use the facts surrounding the murder in determining petitioner's suitability for parole.  Indeed it

6  is doubtful that such a promise would be made by any prosecutor's office.  Compare United

7  States v. Anderson, 970 F.2d 602, 608 (9th Cir. 1992), as amended on denial of rehearing, 990

8  F.2d 1163 (9th Cir. 1993) ("The agreement seemingly contemplates either limiting the

9  information made available to the parole board or dictating the action to be taken by the parole

10 board in a particular case. Either course frustrates the Parole Commission's duty to determine

11 when release is appropriate for a particular defendant.").  Even if petitioner's plea agreement

12 contemplated such a restriction of the board's duty to determine whether petitioner was suitable

13 for parole, petitioner has presented no evidence in support of his claim.  He has not borne his

14 burden of showing he is entitled to the issuance of the writ.  Silva v. Woodford, 279 F.3d 825,

15 835 (9th Cir. 2002) (petitioner's burden to show he is in custody in violation of the constitution).

16         In this portion of his writ,  petitioner also alleges he has been denied due process

17 because the parole board has adopted an unwritten "no parole" policy and created an "artificial

18 'presumption of unsuitability' based upon 'special circumstances. . . .'" Pet. at 5(b).  Once again,

19 however, petitioner has made the assertion without providing any supporting evidence.  He has

20 not borne his burden of showing constitutional error.  Silva, 279 F.3d at 835.

21         B.  Failure To Consider All Factors

22         Under California law, the parole board is not to set a parole date if, among other

23 things, it finds that the gravity of the potential parolee's current and prior offenses are such that

24 "public safety requires a more lengthy period of incarceration. . ."  Cal. Penal Code § 3041(b).

25 Also, parole must be denied without regard to time already served, if release will pose "an

26 unreasonable risk of danger to society."  Cal. Code of Regs. tit. 15, § 2402(a); see In re

1   <u>Rosenkrantz</u>, 29 Cal. 4th at 654.  The specific factors the parole board is authorized to consider

2   in determining whether someone is suitable for parole are found in the California Code of

3   Regulations; the factors include an inmate's social history, mental state, past criminal history,

4   commitment offense, criminality generally, and conditions capable of treating or controlling

5   behavior upon release.  Cal. Code Regs. tit. 15, § 2402(b).

6           As noted above, the Ninth Circuit has determined that California's statutory

7   scheme gives prisoners a liberty interest in release on parole.  <u>McQuillion</u>, 306 F.3d at 902.  The

8   existence of this liberty interest entitles a prisoner to various procedural protections as part of the

9   parole determination, including a hearing, a statement of reasons for the denial of parole, and a

10  denial of parole based on "some evidence," with some "indicia of reliability."  <u>Greenholtz</u>, 442

11  U.S. at 15-16; <u>McQuillion</u>, 306 F.3d at 904; <u>see also</u> <u>Jancsek v. Oregon Bd. of Parole</u>, 833 F.2d

12  1389, 1390 (9th Cir. 1987).  However,

13          nothing in the due process concepts as they have thus far evolved []
            requires the Parole Board to specify the particular "evidence" in the
14          inmate's file or at his interview on which it rests the discretionary
            determination that an inmate is not ready for conditional release.
15

16  <u>Greenholtz</u>, 442 U.S. at 15.

17          In this case, the parole commissioners noted petitioner's positive work reports,

18  laudatory chronos, self-help and educational endeavors and his parole plans.  Answer, Ex. B at

19  9-14.  In addition, the commissioner who gave the reasons for the denial of parole discussed

20  petitioner's positive accomplishments, but found that they did "not outweigh the factors of

21  unsuitability."  <u>Id</u>., Ex. B at 30.  There is no constitutional requirement that the board do more.

22          C.  <u>Delay In Parole Hearing</u>

23          Petitioner argues that his hearing was delayed for ten months and the board failed

24  to take this into account in scheduling his next hearing.  Pet. at 5(f)-5(g).  "However, due process

25  'does not include receiving a parole hearing in exact accordance with the specific time period

26  required by [state regulations].'"  <u>Johnson v. Paparozzi</u>, 219 F.Supp.2d 635, 652 (D.N.J. 2002).

1 Moreover, petitioner has not shown any prejudice from the delay.  Cf. Jefferson v. Hart, 84 F.3d

2 1314, 1316-17 (10th Cir. 1996) (denial of timely parole proceeding is not per se violation of due

3 process); cf. Camacho v. White, 918 F.2d 74, 79-80 (9th Cir. 1990) (to show due process

4 violation from delayed parole revocation hearing, petitioner must show prejudice from the delay).

5     D.  Double Jeopardy

6        Petitioner argues that the board's "relitigation of his commitment offense to find

7 that a . . . 'special circumstances' offense had been committed violates double jeopardy

8 principles."  Pet. at 5(g)-5(I).  Once again he relies on the board's finding that petitioner

9 committed the murder during the course of an armed robbery to deny parole, which he says, in

10 his case, has converted his sentence to life without the possibility of parole.  Pet. at 5(h).

11        The Fifth Amendment guarantee against double jeopardy protects against a second

12 prosecution for the same offense after acquittal, against a second prosecution for the same

13 offense after conviction, and against multiple punishments for the same offense.  Monge v.

14 California, 524 U.S. 721, 727-28 (1998).  Petitioner was sentenced to an indeterminate term of

15 twenty-five-years-to-life with the possibility, not the guarantee, of parole.  Accordingly, the

16 denial of parole does not impose an additional or more onerous punishment for his commitment

17 offense.  Mahn v. Gunter, 978 F.2d 599, 602 n.7 (10th Cir. 1992) (denial of parole does not

18 increase sentence and so does not create additional punishment).

19     E.  The Use Of Commitment Offense To Set Next Hearing In Two Years

20        Petitioner also argues that the board violated his constitutional rights by using the

21 nature of his commitment offense to find him unsuitable for parole and also to set his next

22 hearing.  Pet. at 5(I)-6.

23        Under California Penal Code section 3041.5(b)(2)(A), the board should hear each

24 case annually after an initial denial of parole, but may extend the time for the hearing to two

25 years if it makes special findings.

26 /////

1    As noted above, in the context of a parole hearing, due process is satisfied when

2  the prisoner is afforded notice of the hearing, an opportunity to be heard and, if parole is denied,

3  a statement of the reasons for the denial. Jancsek, 833 F.2d at 1390.  Due process does not

4  require that the board's decision to set the next hearing for two years rather than one be justified

5  by any reasons; its reliance on some of the same facts as it used to deny parole accordingly does

6  not violate due process.

7    Violation of state mandated procedures will constitute a due process violation

8  only if the violation causes a fundamentally unfair result.  Estelle v. McGuire, 502 U.S. 62, 65

9  1991).  Petitioner has not shown that the board's dual reliance produced a fundamentally unfair

10  result in his case.  Here as well, he has not borne his burden of showing he is entitled to relief.

11    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

12  writ of habeas corpus be denied.

13    These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

15  days after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

18  shall be served and filed within ten days after service of the objections.  The parties are advised

19  that failure to file objections within the specified time may waive the right to appeal the District

20  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21  DATED:  February 24, 2006.

22

23

24  _____
   UNITED STATES MAGISTRATE JUDGE

25

26  2/will2323.157